Thank you. The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good afternoon. We're happy to hear argument in our last case today, Moreno-Osorio v. Garland. Mr. Valera? Good afternoon, Judge Moss. Good afternoon, Judge McKee. Good afternoon, Judge King. I am deeply honored once more to present oral arguments for this court for the fifth time, and hopefully I'll be able to achieve immigration justice for my client, the petitioner. Your Honor, the petitioner has brought four issues before this court. The first important issue is whether the Virginia Code 18.2-51, unlawful wounding, a crime of A-43F that bars petitioner from asylum relief. Now, in resolving this issue, Your Honors, we submit that the Castleman, the United States v. Castleman case decided in 2014 should not be applied. More specifically, the Castleman's holding that the knowing or intentional causation of bodily injury necessarily involves the use of physical force should not be taken out of its context and applied here. It should not be applied here, Your Honors, because the physical force referred to in the Castleman is the common law offensive touching force and not the violent force under Johnson. Counsel, you're familiar with our decision in Rumley, right? Yes, Your Honor. The 2020 decision, which directly rejects that argument, right? Yes, Your Honor, but what we are arguing here, Your Honor, is since the case of Rumley is based on Castleman and the Castleman issue and the case relative to Rumley pertains to the enhancing provisions of the Armed Career Criminal Act, this should not be applied here specifically in cases of immigration. And the reason for that, Your Honor, is that when Castleman was decided by the Supreme Court, the Supreme Court then said that we began by observing that a common law, the element of force in the crime of battery was satisfied even the slightest offensive touching. And we recognize the general rule that the common law term of art should be given its established common meaning, except where that means... Counsel, if I could interrupt you for a minute. Is your argument that Rumley is wrongly decided? No, Your Honor. No, Your Honor. What we are arguing is it should not be applied in this immigration law because, in this immigration case, because the violent force contemplated in Johnson and not the Castleman physical force that includes the presumptive common law definition. Now, in this backdraft, Your Honor, what we are submitting is under the 18 U.S.C. 16A, defining the crime of violence as an offense, that as an element, the attempted use or threatened use of physical force, Castleman's holding should not be applied as this was made within the context of misdemeanor domestic violence crimes due to the unique nature, Your Honor, of domestic violence under 18 U.S.C. 92G9. And the purpose of which is to close, according to the control laws, where many perpetrators of domestic violence are convicted only of misdemeanors, when all too often, the only difference between a battered woman and a dead woman is the presence of a gun. It should not be applied within the context of the Immigration and Nationality Act, which has its own species, Your Honors, of crimes that have different effects. Like, for example, there are crimes that are considered crimes involving moral torpitude offenses, which, though a ground for removal, is not a ground of ineligibility for asylum. And aggravated felonies, which is both a ground of removal and a disqualification of asylum. Now, with this conviction of the petitioner, he was, in fact, disqualified and barred from seeking the relief of asylum because of the context of unlawful wounding. Now, as we pointed out, Your Honor, in our briefs and citations, while bodily injury comprehends, it would seem, any bodily hurt whatsoever, breaking the skin, for example, not required. While the statute does not define bodily injury, courts have been reluctant to give jurists a definition because of the praise of an everyday, ordinary meaning, which means, as pointed out in the Custodial Monument, Your Honors, it is hard to describe as violence a squeeze of the arm that causes a bruise. Yet, a bruise would be encompassed by bodily injury. Now, since bodily injury may be inflicted without using violent force, then the use of physical force, that is violent force, is not a necessary element for Virginia 18.2-51 unlawful wounding. And consequently, Your Honors, unlawful wounding is categorically not a crime of violence, which brings us to the context that even in the case of Castleman, when it was brought before the Sixth Circuit Court, the Sixth Circuit Court applying Johnson v. the United as a misdemeanor crime of domestic violence, as Castleman could have been convicted for causing a slight, non-serious physical injury with conduct that cannot be described as violent. But of course, the Supreme Court made a ruling on the crime of violence, but still, the fact remains that it applies mainly to domestic violent cases. That's why the intent of Congress on the it is the use of violent force. That's why there are different immigration consequences relative to a particular offense, whether it will be classified as CIMT, or a crime involving moral torpitude, or whether it will be classified as an aggravated felony. But here, misdemeanor domestic violence, because of the unique circumstance of domestic violence, is considered an Ramli is good and correct, Your Honor. Although it cited Castleman, what we would like this court to do is not to apply that in terms of petitioners being barred from applying for asylum, for which, according to the decisions of the judge and the Board of Immigration This brings me also on the second issue, which maintained that the Board committed a reversible error in holding that what happened to Petitioner does not rise to the level of persecution. Without stating its own reasons, Your Honor, the Board agreed with the Immigration process of Avalos v. Lynch and Valladares v. Holder, where the respondents were threatened three times by gun members with guns pointed to their heads. And according to the immigration What about your particular social group here, which would apply both to asylum and withholding of removal? If you don't have a valid particular I don't think we get to any of the other issues on those two items, do we? That's correct, Your Honor. Precisely, our position is that it's a reversible error for the Board to maintain that petitioner's PSG, or particular social group, and it does not lack this particularity relative to the context of the case of Amalia v. Rosset. For example, Your Honor, we just received yesterday Let me ask you just for an example here. As I got this from the BIA and IJ decisions, the particular social group identified was individuals returning from the United States or returning migrants from the United States. Is that is that correct? That's correct, Your Honor. If someone from Honduras goes to Disney World and they visit Disney World and they come back, they're an individual returning from the U.S. or a returning migrant? Well, Your Honor, again, the context of the returning migrant or immigrant in terms of the petitioner's case referred to groups of people who have been deported or have been removed from the United States. In a sense, you can say that they are considered arriving migrants or returning migrants if they return, but that particular example would not fit in within the context of what we are trying to expound on. How do we tell that from the language that you use, though? Well, Your Honor, with respect to the broadness, if we look at the decisions decided by the Circuit Court of Appeals, for example, on Perdomo v. Holder, the size and breadth of a group alone does not preclude a group from qualifying such as a group. In fact, as I was mentioning earlier, Judge, Your Honor, in Amaya v. Rosen, we fail, according to the Court, we fail to see how this reasoning of the BIA, well, it rejects that argument that pertaining to the subdivision or you are further subdividing the group in any number of ways by age, sex, background, or by level of involvement with a gang. So what the Court is saying is that there are smaller group parts to any whole. What matters is not whether the group can be subdivided based on some arbitrary characteristics, but whether the group itself has clear boundaries. Now, in the case of the petitioner, if you look at the facts of the case and it's crystal clear that when he returned to Honduras, a day after his return, he was immediately identified and was threatened and basically forced him to leave. Now, the Honduras government, Your Honor, specifically recognized this particular group of people, in fact, assisting by virtue of their decree, assisting returning migrants to Honduras, considering the nature and context of the danger that they are facing if returning to their country of origin. And we submit, Judge, that the respondents proposed PSG of returning arriving and returning migrants. Based on the yardstick of AMAYA, the legal standard is not what the government is saying that whether or not the group has clear boundaries with objective goalposts delineating the boundaries to the group. Instead, what AMAYA is saying, as I've mentioned earlier again, is the fact that it could further subdivide the group in any number of ways, and it only points out that there are smaller parts to any whole. So what matters, again, is whether the group can be subdivided based on some arbitrary characteristics, but whether the group itself has clear boundaries. So in the first instance, the government utilized the wrong standard. That's the reason why it yesterday relative to the supplemental authorities, Judge. Now, the context of broadness with regard to the case notably of the case of Galdamas versus Holder, the court noted the admission of the government that the particularity requirement is not an attempt to impose a numerical limitation on the size of a particular social group. Counsel, your time has expired, and I'm going to let you go a little over. You've reserved some time for rebuttal, haven't you? Yes, I'll reserve my time for the rebuttal. So we'll hear from the government, and I think we understand the gist of your argument. Thank you, Judge. Thank you. Good afternoon, Your Honors. Allison Freyer for the Attorney General, and may it please the Court. In this case, there are three applications for relief and protection at issue, asylum, withholding of removal, and protection under the Convention Against Torture. Because the agency did not err in denying any of those applications, the petition for review should be denied. First, with respect to the asylum application and the crime of violence finding, petitioner's argument here that the statute of conviction does not necessarily involve a sufficient level of force has already been rejected by this court in Rumley, and his of the ACCA violent felony provision and 18 U.S.C. section 16a are nearly identical. And to the extent that they differ, section 16a is actually broader because it permits crimes to be a crime of violence if the force is used against the property of another person, whereas the violent felony provision requires force to be used against the person of another. So any violent felony will necessarily be a crime of violence as well, and the Supreme Court's decisions in Johnson and DiMaia illustrate that fact. The court applied its decision in Johnson to the immigration context in DiMaia without any difficulty or need for great discussion, and the same should happen here. Rumley controls. Moving on to the withholding application, the question of the cognizability of the particular social group is dispositive of the entire application for withholding of removal, and therefore the court need not reach the question of whether Mr. Moreno-Ozorio was subjected to past mistreatment, rising to the level of persecution. The agency properly found that his proposed group was not sufficiently particular. The group that he proposed before the agency was returning migrants from the United States. This court should reject any attempt to finesse or change his group at this late stage. Any such group would be both unexhausted and the agency was correct in determining that that group lacks sufficient particularity. The board noted that Mr. Moreno-Ozorio claimed that the IJ was improperly concerned about the size or breadth of the group, and the board properly rejected that argument, saying that the IJ did not consider only the breadth of the group, but also whether it was clear who was in the group and who was not in the group. The question of clearer benchmarks or objective goalposts has always been a very critical part of particularity, and the agency properly ruled that those terms are not clear on their face. They are not a sufficient benchmark for membership. In his brief, Mr. Moreno-Ozorio asserted that those terms have clear meanings, but he never provided them, probably because the government's position is they do not actually have clear meanings that would be the same to everyone. Moreover, the agency did not err in ruling that the threats did not rise to the level of past persecution. The record does not compel that conclusion. Mr. Moreno-Ozorio was threatened on one occasion by a group of men who did not know his name until his cousin told them they did not know that he'd returned from the United States until his cousin told them they did not attempt to harm him or even threaten him with their weapons. They didn't know where he lived, they didn't know his phone number, and so that single threat does not rise to the level of persecution. The law is clear that persecution must be severe, and the record cannot compel the conclusion that that single incident rises to the requisite level of severity. Finally, with respect to cat protection, the record does not compel the conclusion that the Honduran government would acquiesce in any future torture of Mr. Moreno-Ozorio. The police accepted a report from Mr. Moreno-Ozorio's aunt, although Mr. Moreno-Ozorio believes they did not investigate the report. It's not clear exactly what the police could have done under these circumstances. By the time his aunt reported the incident, Mr. Moreno-Ozorio was here in the United States more than a year had gone by since the incident, and so without a victim or proximity in time and place to the threat, there wasn't much that the police simply could do. They accepted the report, they did not attempt to turn Mr. Moreno-Ozorio's aunt into a victim, and so it's not clear that the police would help Mr. Moreno-Ozorio upon return should he need it. Moreover, Mr. Moreno-Ozorio relies on threats to his aunt to suggest that the police acquiesce in the gang's activities, but Mr. Moreno testified that the threats to his aunt dealt with him, not with her, and therefore she was able to safely report a gang crime to the police without experiencing any problems with the gang as a result of that report, also undermining that the police would not acquiesce in the gang's activities. Generalized country conditions of corruption and impunity are certainly troubling, but they are insufficient to compel the conclusion that Honduras would acquiesce in the gang's activities, particularly where the record shows that the Honduran government has taken specific, concrete, effective actions to deal with corruption in its ranks. Those were all the points I wanted to hit. Are there any questions from the bench? I don't think we do have any questions. We thank you very much for your argument. Thank you. Mr. Valerio, you have a rebuttal, I think. Yes, Your Honor, this will be a short rebuttal, Your Honor. It is true that this was a single occasion as compared to the three occasions in Hernandez-Avalos versus Crespin-Valladores, but nothing in the decisions of the Fourth Circuit, Your Honors, that requiring that the applicant be threatened thrice, with pointed gun to the head before he can be deemed persecuted. The decisions of this Court are clear. Death and threat of death constitutes persecution, and clearly this is the case here. Now, with respect to Amaya versus Rosen, the government cannot use the reasoning based on that Amaya versus Rosen because the BIA and the immigration judge made a decision stating that there is no particular social group because it is too broad and it is diverse. Amaya's test or legal standard is whether the group has clear boundaries with objective goalposts delineating boundaries to the group. Now, with respect, Your Honor, to the Convention Against Torture, we have submitted sufficient evidence to show acquiescence of police authorities to his torture. And in fact, it is true that country conditions, the impunity is an integral part of proving acquiescence of police authorities. But in this particular case, Your Honor, we have submitted court cases where it indicates, for example, where there is an inability on the part of the government to control. Like, for example, what happened in Los Setas, a typical gang group or drug cartels, and they failed because of the corruptions and the connections of these cartels to the government and to the police, then obviously it is a clear indication of acquiescence. And we have submitted that this has been corroborated by the country reports of our government showing the increased murders where they have elevated Honduras as the murder capital of the world and the failure on the part of the government to seriously address the issue of corruption of the police force. So in this context, Judge, I do believe that we have a case for a remand and a reversal so that the petitioner, number one, on the context of the conviction of unlawful wounding, it should not be classified as a crime of violence and hence an aggravated felony that disqualified him from the of the issue of particularity, which the BIA and the immigration judge, as indicated by the supplemental authorities presented by the government, are not actually the standard set forth in Amaya v. Fawcett. Thank you, Your Honor. Thank you very much. We'll ask the clerk to adjourn court. We thank you for your arguments and stay safe. Stay safe, Your Honors. This honorable court stand adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Diana Gribbon Motz, Robert B. King, G. Steven Agee